# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALVARO MONTANEZ REYES, | Case No. 1:16-cv-00043-LJO-EPG-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| WARDEN OF CSP-CORCORAN, | |
| Respondent. | |

Petitioner Alvaro Montanez Reyes is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the petition, Petitioner raises the following claims for relief: (1) instructional errors; (2) insufficient evidence to support his convictions; and (3) sentencing error.

For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

On April 18, 2011, Petitioner was convicted by a jury in the Merced County Superior Court of first-degree felony murder and aggravated kidnapping. The jury also found true the felony-murder special circumstance allegation. (4 CT[1] 821–22). The trial court sentenced Petitioner to life without the possibility of parole on the murder count. The sentence of life with

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on May 23, 2016. (ECF No. 16).

the possibility of parole on the aggravated kidnapping count was stayed. (4 CT 911). On December 16, 2014, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Reyes, No. F063993, 2014 WL 7151809, at *12 (Cal. Ct. App. Dec. 16, 2014). The California Supreme Court summarily denied the petition for review and petition for exhaustion on March 11, 2015. (LDs[2] 14, 15).

On January 13, 2016, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). Respondent has filed an answer. (ECF No. 14).

## II.

## STATEMENT OF FACTS[3]

This case involves the kidnapping and murder of Rosa Avina (the victim). The prosecution's main witness was Luis Vazquez, an accomplice to the crime. In exchange for his truthful testimony, Vazquez was allowed to plead to the lesser charge of kidnapping and first degree burglary and received a sentence of nine years four months. In addition to his testimony, Vazquez's DVD-recorded statement to police was played before the jury. Below we summarize his testimony and supplement it with his prior statement.

On October 23, 2007, Vazquez was living with his family on Sycamore Street in Delhi. At the time, his friend Luis Valencia was living there as well. On the day in question, Vazquez was sitting on his porch when he observed Valencia drive up in an unfamiliar gray (sometimes described as silver) Pontiac followed by defendant, who was driving a red Lexus. While at the house, defendant asked Valencia to do him a favor and help him with a problem that the owners of the gray Pontiac had. Defendant and Valencia had a discussion regarding some "drug dealers" missing marijuana that apparently had been taken by the victim. During the conversation, Valencia told defendant to pick up the victim. Defendant was the only one of the three men who knew the victim and the "drug dealers."

Valencia and defendant agreed they were going to take the victim "[s]omewhere in the fields." Vazquez believed they were going to "rough up" the victim to get her to give up the missing marijuana or money. Defendant left to get his truck and to pick up the victim. At the time, defendant drove a light brown Ford F150 pickup truck. Approximately 10 minutes after defendant left, Vazquez retrieved some zip ties and tape from the house while Valencia retrieved his loaded rifle. The two then left the Sycamore Street house in the gray Pontiac. They drove to a house on Clifford Avenue in Turlock, arriving sometime after dark.

Vazquez initially met defendant at the Clifford house through Valencia a few months earlier. The men had gathered at the house several times to smoke methamphetamine. Vazquez was surprised they arrived at the home on Clifford as

---

[2] "LD" refers to the documents lodged by Respondent on May 23, 2016. (ECF No. 16).
[3] The Court relies on the California Court of Appeal's December 16, 2014 opinion for this summary of the facts of the crime. See Vazquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

2

he thought they were taking the victim to some fields, but he assumed there was a change in plans.

Upon arriving at the house, Valencia knocked on the door and a person named "Cheque" answered. Valencia asked Cheque for some sheets and instructed Vazquez to cover the Pontiac with the sheets and also to retrieve a plastic gun from the trunk. Vazquez did as instructed, and the three men congregated in a small tool shed and waited. While waiting, the men smoked methamphetamine. Approximately five minutes later, defendant arrived, and they could hear him and another person enter the house. Shortly after they entered, Valencia said "let's go" and he proceeded to knock on the door and then kicked it open when someone answered. The men stormed in and ordered everyone to the ground. Valencia was armed with the rifle and Vazquez had the toy gun and a two-by-four.

When they entered the house, Vazquez had on a hood and a bandana covering his face. He did not recall if Valencia had anything covering his face. As there was no electricity in the home at the time, Valencia and Vazquez carried flashlights.

Vazquez saw three people inside the home on Clifford: defendant, the victim, and a man he knew as "Mosca." Valencia began yelling at the victim to shut up, and he kicked her several times while she was on the floor. Defendant and Mosca were also on the floor, but they were not assaulted. Vazquez told defendant not to move or he would shoot him, even though defendant was in on the plan and knew what was going to happen. Vazquez testified they wanted to "make it look good" so the victim would not know she was being set up.

Valencia and Cheque bound the victim's arms and legs with zip ties and covered her face with tape. Valencia told Vazquez to tie up the others as well, so Vazquez first tied up Mosca, took him to another room, and returned for defendant. Vazquez told defendant "it's your turn" and defendant began crawling on his own toward the other room. Once in the room, Vazquez told defendant to stay there, but did not restrain him in any way as he was part of the plan.

While in the house, Valencia took a ring from the victim as well as a small amount of methamphetamine. The men were looking for a pound of marijuana but were unable to find it. Vazquez asked the victim where the marijuana was, and the victim replied, "Martha." Valencia told Vazquez to move the Pontiac closer to the door. As defendant's truck was in the way, Vazquez asked defendant for his keys. Defendant provided them and Vazquez moved both defendant's truck and the gray Pontiac. Apparently not satisfied with the location of the Pontiac, Valencia took the keys and moved the car even closer to the house. Vazquez noted Valencia had backed the car up to the door and opened the trunk. Upon returning to the house, Valencia told Vazquez and Cheque to help him, and the three men carried the victim to the trunk of the Pontiac. Valencia closed the trunk and told Vazquez to get into the back seat and lie down so no one would see him. Valencia then drove back to their house on Sycamore.

During the drive, Vazquez tried to talk to the victim, but he could not hear her while they were on the freeway. Upon arriving at their home on Sycamore, Valencia told Vazquez to take the rifle back into the house. Approximately five minutes later, defendant arrived in his truck and then got into the Pontiac where Valencia was waiting. Defendant told Vazquez he would be right back. Neither Valencia nor defendant told Vazquez where they were going. The two returned in the Pontiac 30 to 45 minutes later. When they returned, they were accompanied by Urbano Ortega and Omar Cebrero. All four men were in the Pontiac.

Upon their arrival, the four men in the Pontiac—defendant, Valencia, Ortega and Cebrero—exited the car and began talking. At some point, Vazquez approached the group. From the discussion, Vazquez understood that Ortega and Cebrero were the "drug dealers," the ones who were trying to recover the missing marijuana. Vazquez noted Ortega was the one doing most of the talking. During the discussion Ortega stated "it was kind of bad" they could not find the marijuana. Vazquez agreed but pointed out that the victim was "right there," " 'whatever you guys want to do, that's up to you guys.' " Defendant was present when he said this. At that point, defendant began to walk away toward his truck. As defendant began walking away, Valencia said he knew what to do, and told Vazquez to get a bottle. Defendant was about 12 feet away at the time.

Vazquez retrieved a small plastic soda bottle that Valencia then filled with gasoline and said he would be right back. At this point defendant was inside his truck; Vazquez joined him, and the two began smoking methamphetamine. Valencia then left in the gray Pontiac with Ortega and Cebrero. The men returned five to 10 minutes later; Valencia got out of the car and the other two men left. Valencia joined defendant and Vazquez in the truck and smoked methamphetamine.

Sometime later a woman arrived, and defendant, Vazquez, Valencia and the woman went to the Clifford house in Turlock. While there, they smoked more methamphetamine but did not talk about the crime as there were others present who had not been involved. Subsequently, Valencia told Vazquez he had taken the victim to a field, put her in a boat, poured the gasoline on her, " 'and the other guy lit her up.' " Defendant was not present when Valencia made the admission.

Vazquez stated the men had never talked about killing the victim; rather his understanding was they were going to take her to a field and assault her in order to get the drugs back. Defendant had only asked for Valencia's help initially. Vazquez went along with the others because he wanted to protect Valencia.

Vazquez's recorded interview with the police was played for the jury. He made several statements to the detectives that were inconsistent with his trial testimony. Vazquez explained he had told the detectives things that would help him.

Vazquez admitted he had been smoking methamphetamine heavily during that time period and had been awake for two days prior to the murder.

Serbrina Girvin was in a relationship with the victim during the relevant time. She recalled that on the day in question she was with the victim and a few others using drugs. The victim had been on the telephone talking to someone and then decided to leave. Girvin became upset and argued with the victim because the victim was more interested in talking on the phone. Girvin told her she was leaving. The victim replied she was also leaving, saying she was going to the store. Girvin saw the victim get into a tan truck with a male Hispanic driver. There were several people outside when this happened, including Jesus Cruz. Cruz wanted to go with the victim in the truck but the victim told Cruz he could not come. Cruz testified that on the day of the kidnapping he had given the victim a ring to sell for him.

Cruz recalled getting a ride to Turlock that morning with the victim in a gray Pontiac Grand Am and with two men who went by the nicknames "Torneo" and "Oaxaca." Cruz recalled the victim got into an argument with the driver of the Pontiac. He said he saw the victim with a small baggie of methamphetamine but

denied seeing any marijuana. However, Cruz had told a sheriff's deputy sometime after the crime that he saw a pound of marijuana in the car. Cruz stated the owner of the Pontiac lived at a house with a fountain in front.

Later, Cruz and the victim met up with Girvin and some others, and the victim subsequently got into a brown truck with a Hispanic male driver. Cruz wanted to go with them, but the victim told him no, and the driver told him to stay there. Although he denied it at trial, Cruz had told a sheriff's deputy that he tried to get into the truck with the victim, but the driver locked the door.

On the morning of October 24, 2007, Merced County Sheriff's Deputy Frank Swiggart responded to the report of a person who had been burned in the area of Ballico. When he arrived, he discovered the victim severely burned, with her arms and legs bound, and plastic wrapped around her head. The victim asked several times if she was alive. The area where the victim was discovered was rural with orchards.

Detective Charles Hale was notified of the victim's discovery and responded to the scene. He interviewed the victim, but due to her condition, it was very brief. She told him she had been picked up by defendant in a gold truck and was driven to a house in Turlock. She further relayed that while at the house someone knocked at the door, then people came in with guns and told them to get down. She was tied up and tape put on her face. She did not know who had done this to her. Hale observed the tape had a distinctive pattern and had melted onto the victim's face.

Hale located the area where the victim was burned in a nearby orchard. At the scene, deputies located a boat that was still smoldering, a plastic soda bottle that smelled of gasoline, and shoe prints.

The following day, defendant was interviewed in association with this case. During the interview, defendant initially gave a confusing account of picking up the victim after she had asked him for a ride. After the officers explained they had spoken to the victim, defendant eventually admitted he had given the victim a ride to a house on the day she was kidnapped. He claimed the victim called him and asked for the ride. He took her to a house, and shortly after arriving, armed men came in, ordered them to the ground, and began kicking them. Defendant claimed he was a victim; he had been kicked by the perpetrators, and the men threatened to kill him. He believed the victim was beaten badly, but he was taken to another room so he did not see everything. The men kept asking the victim questions, but her responses were muffled as if they had covered her mouth. He heard the men say something to the effect of " 'If you did it, or if you have it we're gonna kill you.' " After some time, the men told defendant to leave and he did so. Defendant did not call the police because he did not want his wife to find out he had left his home. After defendant left the house, he went to Valencia's house and told him what happened.

Defendant told the detectives that just after he and the victim entered the house, the victim handed him her cellular phone and asked him to turn it on for her. As he was turning it on, the armed men entered. When asked about the location of the phone, defendant said he broke it because he was upset his wife had found out he had left their home that night. He still had the broken phone at his home.

After the interview, detectives asked defendant to direct them to the house where the victim was abducted. Defendant spent approximately one hour directing the

detectives around the city of Turlock and claimed he could not find the house. After defendant was arrested, he directed detectives to the house on Clifford and admitted he had friends who lived there and had been at the house numerous times. Defendant also directed the officers to the Sycamore house and pointed out Luis Valencia.

As defendant was being returned to the jail, he indicated Omar Cebrero was the person responsible for what happened. The detective asked defendant to show him where Cebrero lived. Although reluctant at first, defendant directed the detective to Cebrero's residence, which was located approximately one and a half blocks from defendant's home and had a fountain in the front. Upon arrival, detectives found a gray Pontiac Grand Am parked at the residence. The car was registered to Cebrero. The car was later processed for fingerprints and the only identifiable print found belonged to Cebrero. Blood was found in the trunk of the Pontiac. Genetic testing on the blood revealed the blood belonged to the victim. In a subsequent interview, defendant stated he believed Cebrero was responsible for what happened to the victim, and it was a result of the victim taking marijuana from Cebrero. He also identified Urbano Ortega as being involved.

The victim died on October 26, 2007, as a result of multisystem failure caused by her extensive thermal burns. Dr. Robert Lawrence, the pathologist who performed the autopsy, noted the victim had a pattern of burns on her body consistent with her being splashed with an accelerant. The victim also had burns in her airway, indicating she had inhaled flames.

During the course of the investigation, officers obtained search warrants for the houses on Clifford and Sycamore as well as defendant's home. Officers discovered zip ties and the same distinctive tape used on the victim at the Clifford Avenue house. During a search of the Sycamore Street house, officers recovered a rifle loaded with nine rounds, as well as tape that matched the distinctive tape used on the victim. At defendant's home detectives discovered a broken cellular phone in the garage. The phone had been smashed into several pieces and the entire circuit board—the brains of the phone—was missing. Without the circuit board, officers were unable to obtain any information from the phone itself.

Hale testified he also discovered shoe prints at the Sycamore house that were similar to those located at the crime scene. The sole pattern from a pair of tennis shoes seized from defendant's bedroom was compared to shoe prints found at the Sycamore house. The comparison revealed defendant's shoe was consistent with a shoe print found at the Sycamore house.

Other items of evidence, such as pieces of recovered tape and the plastic bottle, were also processed for prints, however, none of the suspects' fingerprints were found on the items. Testing of the victim's clothing revealed traces of gasoline.

Valencia was arrested at the Sycamore Street house. After Valencia's arrest, officers monitored jail calls between Valencia and his wife. During one of the calls, Valencia told his wife he had dropped a ring and buried it when he was arrested. In another call, Valencia's wife indicated someone was able to recover the ring. Officers later contacted Valencia's wife and were able to seize the ring. Both Jesus Cruz and Vazquez identified the ring as the one taken from the victim.

Sheriff's Deputy Clint Landrum testified as an expert regarding marijuana. He noted a pound of marijuana was worth between $500 and $800 in 2007. In his

experience violence is associated with the sale of drugs, including marijuana, and he was aware of cases where people were killed regarding drug sales.

Reyes, 2014 WL 7151809, at *1–5.

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Merced County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the claim is reviewed de novo. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

8

AEDPA requires considerable deference to the state courts. The Court looks to the last reasoned state court decision as the basis for the state court judgment. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 568 U.S. 289, 297 n.1 (2013); Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not *de novo* review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

## IV.

## REVIEW OF CLAIMS[4]

### A. Instructional Errors

Petitioner raises challenges to the jury instructions given at his trial. Specifically, Petitioner asserts that the trial court erred by: (1) not including the element of a secondary victim in its aggravated kidnapping instruction; and (2) failing to instruct that the felony-murder special-circumstance allegation, as applied to an aider and abettor, required finding the defendant intended to kill the victim.

---

[4] The petition itself appears to raise two claims: (1) the trial court's failure to instruct on all elements of an offense; and (2) sufficiency of the evidence. Petitioner does not provide any supporting facts. (ECF No. 1 at 4). However, attached to the federal habeas petition are the state petition for review and the California Court of Appeals opinion. (ECF No. 1 at 8–61). Therefore, the Court construes the petition as raising the claims and issues raised on direct appeal to the California Court of Appeal. See Allen v. Calderon, 408 F.3d 1150, 1153 (9th Cir. 2005) (citing Maleng v. Cook, 490 U.S. 488 (1989)) ("[T]he district court must construe *pro se* habeas filings liberally."); Bernhardt v. Los Angeles County, 339 F.3d 920, 925 (9th Cir. 2003) (noting that courts have a duty to construe *pro se* pleadings and motions liberally).

1    1. <u>Legal Standard</u>

2    "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for

3    habeas relief." <u>Estelle v. McGuire</u>, 502 U.S. 62, 71–72 (1991). A federal court's inquiry on

4    habeas review is not whether the challenged instruction "is undesirable, erroneous, or even

5    'universally condemned,' but [whether] it violated some right which was guaranteed to the

6    defendant by the Fourteenth Amendment." <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973). "In a

7    criminal trial, the State must prove every element of the offense, and a jury instruction violates

8    due process if it fails to give effect to that requirement." <u>Middleton v. McNeil</u>, 541 U.S. 433, 437

9    (2004). However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to

10   the level of a due process violation." <u>Id.</u> The pertinent question is "whether the ailing instruction

11   by itself so infected the entire trial that the resulting conviction violates due process." <u>Estelle</u>,

12   502 U.S. at 72 (internal quotation marks omitted) (quoting <u>Cupp</u>, 414 U.S. at 147).

13   2. <u>Aggravated Kidnapping</u>

14   Petitioner asserts that the crime of aggravated kidnapping, California Penal Code section

15   209(a), "requires that a person other than the kidnap victim must provide the ransom or

16   extortion." (ECF No. 1 at 16, 31–35).[5] Petitioner asserts that the trial court therefore erred by not

17   including this element in its aggravated kidnapping instruction. Respondent argues that whether

18   section 209(a) requires a second victim is a state law issue that a federal habeas court cannot

19   review. (ECF No. 14 at 19).

20   This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate

21   District, which denied the claim in a reasoned decision. The claim also was raised in the petition

22   for review and petition for exhaustion, which the California Supreme Court summarily denied.

23   As federal courts review the last reasoned state court opinion, the Court will "look through" the

24   summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135

25   S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806.

26   In denying Petitioner's instructional error claim regarding aggravated kidnapping, the

27   California Court of Appeal stated:

28   _____
     [5] Page numbers refer to the ECF page numbers stamped at the top of the page.

**II. Aggravated Kidnapping Does Not Require a Second Victim**

Defendant argues the crime of aggravated kidnapping requires the perpetrator to act with the purpose of extorting something of value from a person other than the victim. We disagree.

Section 209, subdivision (a) provides in pertinent part:

> "Any person who ... kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony."

Defendant was charged in the first amended information with "a violation of section 209(a) ..., kidnapping to extract any valuable thing from another person, to wit: Rosa Avina." Defendant argues that kidnapping for extortion under section 209 requires the valuable thing must be taken from a person other than the victim, and he concludes his conviction must be reversed because the People failed to "prove that [defendant] intended to extort anything of value from a third-party." Not so.

The court in *People v. Superior Court* (*Deardorf*) (1986) 183 Cal.App.3d 509 rejected a similar argument. There, the trial court dismissed a kidnapping for extortion charge pursuant to section 995, reasoning section 209 required a person other than the victim to pay the extorted money. The People sought a writ of mandate to compel the court to reinstate the charge. The appellate court granted the writ, explaining that a plain reading of the statute belies the argument that kidnapping for extortion requires a second victim. The court explained it was "unaware of any requirement, imposed either by statute or case law, that requires the victim in a kidnapping for extortion case to have someone other than himself step onto the stage in order to provide the crook with an item of value." (*Deardorf*, at p. 513.)

Subsequently in *People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1693, the court held "kidnapping for extortion does not require the person extorted be someone other than the kidnapped victim." The court explained the kidnapping statute is phrased in the disjunctive, therefore "it describes four different types of aggravated kidnapping: (1) for ransom; (2) for reward; (3) to commit extortion; and (4) to exact from another person any money or valuable thing." (*Id.* at p. 1696.) The court specifically rejected the argument that language requiring "another person" applies to the first three types of aggravated kidnapping, noting "that construction is logically precluded by the disjunctive language of the statute." (*Ibid.*) The court in *People v. Kozlowski* (2002) 96 Cal.App.4th 853, 870–871, followed *Ibrahim,* also finding that one may be convicted of kidnapping to commit extortion even if the kidnap and extortion victim are the same person.

Both *Ibrahim* and *Kozlowski* acknowledge two cases that appear to reach a contrary conclusion. In *People v. Chacon* (1995) 37 Cal.App.4th 52, 63, the court addressed an argument that the kidnapping was for the purpose of robbery, not extortion. However, the defendant there was charged with kidnapping for ransom, not kidnapping for extortion. Nevertheless, the court explained the difference between robbery and extortion, and noted that where a ransom demand is made upon someone other than the kidnapping victim, no robbery occurs. (*Ibid.*) The court, relying on *People v. Martinez* (1984) 150 Cal.App.3d 579, 590–591, then

noted section 209 applied "to those situations involving a primary and secondary victim, where one of the victims is held or taken away and the other is subjected to a ransom or extortion demand." (*Martinez,* at p. 591.)

*People v. Martinez,* however, did not hold that all kidnapping for extortion cases must involve more than one victim. Rather, the court simply "categorized the existing cases and concluded the statute was intended to apply to situations involving primary and secondary victims. The court never said those situations represent the *exclusive* application of the statute." (*People v. Ibrahim, supra,* 19 Cal.App.4th at p. 1697.) Rather, *Martinez* addressed the difference between robbery and aggravated kidnapping. (*People v. Martinez, supra,* 150 Cal.App.3d at p. 594.) Thus, the discussion relating to the necessity of primary and secondary victims was dicta.

We agree with the decisions in *Deardorf, Ibrahim,* and *Kozlowski* and conclude that kidnapping to commit extortion does not require a second victim. Likewise, we agree that to the extent that *People v. Chacon* and *People v. Martinez* can be read as stating kidnapping to commit extortion requires two separate victims, we find those statements constituted dicta and decline to follow them.

As kidnapping for extortion does not require a secondary victim, defendant's related argument that the trial court failed to instruct the jury it must find defendant intended to extort something from someone other than the victim likewise fails.

Reyes, 2014 WL 7151809, at *8–10.

To the extent Petitioner asserts the crime of aggravated kidnapping under California Penal Code section 209(a) requires the perpetrator to act with the purpose of extorting something of value from a person other than the victim, the Court finds such a claim is not cognizable in federal habeas corpus because it concerns state, not federal, law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); Estelle, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

To the extent Petitioner asserts the trial court issued an erroneous aggravated kidnapping instruction without the element of a secondary victim, the Court finds that Petitioner is not entitled to federal habeas relief. "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005). Here, the California Court of Appeals held that a secondary victim is not a required element of the aggravated kidnapping offense.

1  Therefore, the trial court did not commit error by failing to include said element in its
2  instructions.

3      Based on the foregoing, the state court's denial of Petitioner's instructional error claim
4  regarding aggravated kidnapping was not contrary to, or an unreasonable application of, clearly
5  established federal law,[6] nor was it based on an unreasonable determination of fact. The decision
6  was not "so lacking in justification that there was an error well understood and comprehended in
7  existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.
8  Accordingly, Petitioner is not entitled to habeas relief on this ground.

9          3.  Special Circumstance Allegation

10     Petitioner asserts that the trial court erroneously failed to instruct the jury that the felony-
11 murder special circumstance allegation, as applied to an aider and abettor, required finding that
12 petitioner intended to kill the victim. (ECF No. 1 at 4, 15, 18). Respondent argues that whether
13 the special circumstance allegation required finding that Petitioner intended to kill is a state law
14 issue that a federal habeas court cannot review. (ECF No. 14 at 28).

15     This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate
16 District, which denied the claim in a reasoned decision. The claim also was raised in the petition
17 for review and petition for exhaustion, which the California Supreme Court summarily denied.
18 As federal courts review the last reasoned state court opinion, the Court will "look through" the
19 summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135
20 S. Ct. at 2276; Ylst, 501 U.S. at 806.

21     In denying Petitioner's instructional error claim regarding the felony-murder special
22 circumstance, the California Court of Appeal stated:

23    **IV. Intent to Kill Is Not a Requirement of the Special Circumstance in this
      Case**
24
25     Defendant argues the trial court erred in failing to instruct the jury that the felony-
       murder special-circumstance allegation, as applied to an aider and abettor,
       required a finding defendant intended to kill the victim. We find no error.
26

---

27 [6] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is
   whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker v. Small, 665
   F.3d 1143, 1148 n.1 (9th Cir. 2011) (citing Early v. Packer, 537 U.S. 3, 8 (2002)). The Supreme Court has noted that
28 a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

Defendant rests his argument solely upon *People v. Anderson* (1987) 43 Cal.3d 1104, 1147, which held "intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved." What defendant inexplicably fails to note is this holding was superseded by statute nearly a quarter century ago. Indeed, as our Supreme Court has expressly recognized:

> "In *People v. Anderson* [, *supra,*] 43 Cal.3d 1104, this court determined that the felony-murder special circumstance, as it then read, applied only to the actual killer or to an aider and abettor who intended to kill. (*Id.* at p. 1147.) In 1990, the voters approved Proposition 115, which expanded the scope of ... section 190.2 by adding subdivisions (c) and (d). Accordingly, a person other than the actual killer is now subject to the death penalty or life imprisonment without the possibility of parole if that person intended to kill *or* was a major participant in the underlying felony and acted with reckless indifference to human life. (*People v. Estrada* [ (1995) ] 11 Cal.4th 568, 575.)" (*People v. Mil* (2012) 53 Cal.4th 400, 408–409.)

Here, in accordance with the current state of the law, the jury was correctly instructed that to prove the felony-murder special circumstance, the prosecution was required to prove either defendant: (1) acted with the intent to kill; or (2) participated in the crime before the killing, was a major participant, and acted with reckless indifference to human life. (§ 190.2, subds. (c) & (d); *People v. Mil, supra,* 53 Cal.4th at pp. 408–409; *People v. Estrada, supra,* 11 Cal.4th at p. 575; see *Tison v. Arizona* (1987) 481 U.S. 137, 158.) As the jury was properly instructed, we find no error.

Reyes, 2014 WL 7151809, at *10–11.

Here, the California Court of Appeals held that in order to prove the felony-murder special circumstance, the prosecution must prove Petitioner *either*: (1) acted with the intent to kill; *or* (2) participated in the crime before the killing, was a major participant, and acted with reckless indifference to human life. "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw, 546 U.S. at 76. Therefore, the trial court did not commit error by instructing the jury that to prove the special circumstance for a defendant who is guilty of first degree murder as an aider and abettor, the prosecution must establish: "1. The defendant's participation in the crime began before or during the killing. 2. The defendant was a major participant in the crime. AND 3. when the defendant participated in the crime, he acted with reckless indifference to human life." (4 CT 818; 3 RT[7] 533–34).

---

[7] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on May 23, 2016. (ECF No. 16).

Based on the foregoing, the state court's denial of Petitioner's instructional error claim regarding the felony-murder special circumstance was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

**B. Sufficiency of the Evidence**

Petitioner asserts there was insufficient evidence to support his convictions for aiding and abetting kidnapping and first-degree felony murder. (ECF No. 1 at 4, 15, 18). Respondent argues that the state court reasonably rejected Petitioner's sufficiency of the evidence claims. (ECF No. 14 at 22, 26).

These claims were raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned decision. The claims also were raised in the petition for exhaustion, which the California Supreme Court summarily denied. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's sufficiency of the evidence claims, the California Court of Appeal stated:

**I. The Evidence Was Sufficient to Support the Kidnapping Charge**

Defendant initially argues the evidence was insufficient to demonstrate he intended to aid and abet the victim's kidnapping. Specifically, he argues the evidence failed to establish he shared the perpetrator's specific intent to kidnap the victim. We find the evidence adequately established defendant harbored the specific intent to kidnap the victim.

When a defendant challenges the sufficiency of the "evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) Further, we review "the evidence in the light most favorable to the prosecution, [asking whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This familiar standard gives

full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

"Whether the evidence presented at trial is direct or circumstantial ... the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Towler* (1982) 31 Cal.3d 105, 118–119.)

" 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.] ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' [Citations.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793.)

The parties agree the victim was clearly kidnapped. The disputed question is whether the evidence established defendant aided and abetted in the kidnapping. A person is liable as an aider and abettor when " 'he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' [Citation.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 486.) Defendant contends the evidence was insufficient to establish he had the intent to facilitate the kidnapping. As he only attacks the intent element of the crime, we will limit our discussion to that aspect.

After a thorough review of the evidence, we find the evidence was sufficient to support the kidnapping charge. According to Vazquez, it was defendant who asked Valencia for his help with the problem regarding the victim. During their planning, Valencia and defendant had agreed to *take the victim to the field.* Vazquez understood they would take her there "to rough her up" in order to obtain the drugs. Defendant agreed to pick up the victim in his truck. Defendant made contact with the victim because he was the only one who knew her. There was evidence that when defendant picked up the victim, he did not allow Cruz to join them and prevented him from entering the truck. The jury could infer from this evidence that defendant was acting on his plan to abduct the victim. Furthermore, before Valencia and Vazquez left their Sycamore home, they obtained zip ties, tape, and a rifle. This indicates the original plan immediately after defendant left to pick up the victim and deliver her to the Clifford house was, at the very least, to restrain the victim.

Vazquez testified he was surprised when Valencia took him to the Clifford house as the plan was to take the victim to the fields. Significantly, Vazquez did not

question Valencia regarding why they were at the Clifford house, rather he "guess[ed] [there was a] change of plans." Defendant assumes that because he went to the Clifford house where Valencia met them, the evidence never established he was privy to the plan to kidnap the victim. We disagree. It was clear from the evidence that defendant and Valencia were making the plans regarding the victim. From the evidence, the jury could infer Vazquez was simply not apprised of the entire plan. Indeed, according to Vazquez, it was defendant who approached Valencia about "the problem" and requested Valencia's help. Vazquez testified he simply went along to protect Valencia. Vazquez noted Valencia did not want Vazquez to get too involved because he did not want to get him in trouble.

From the evidence as a whole, the jury could infer defendant took the victim to the Clifford house so she could be abducted from the house in private. Indeed, there was testimony the men were trying to conceal the fact the victim was being set up by defendant. To this end, the men covered the Pontiac, which belonged to Cebrero, so the victim would not recognize it. Furthermore, while at the Clifford house, the men acted as if defendant was also a victim by ordering him to the ground and ultimately taking him to another room. The jury could infer this was done so the victim would not know defendant had delivered her to her captors.

Once at the house, Valencia carried on with the plan by binding the victim and putting her in the car trunk. According to Vazquez, upon entering the house, they ordered everyone to the ground and began kicking and yelling at the victim. Subsequently the victim's arms and legs were bound and her face covered with tape. Although the house was without electricity, the evidence established Valencia and Vazquez had flashlights. Furthermore, from the testimony it appears the victim was bound before defendant was moved to another room. Vazquez testified Valencia and Cheque bound the victim. Vazquez was then instructed to take the others into another room. Vazquez tied up Mosca and took him to another room and then came back for defendant, telling him it was his turn. Defendant began crawling to the room, so Vazquez allowed him to move of his own accord. Upon entering the room, Vazquez simply told defendant to stay there, he did not restrain him in any way. He allowed defendant to remain unrestrained because "he was part of the plot." When Vazquez returned from taking defendant to the other room, he noted the victim was "still" bound and had her face covered. Thus, the jury could infer defendant was present when the victim was restrained and her face covered with tape.

Additionally, while at the house defendant gave Vazquez his keys so Vazquez could move defendant's truck. Although the testimony did not establish Vazquez ever told defendant why he wanted to move the truck, the fact they were working together is apparent since Vazquez left the keys for defendant after moving the truck. Once Valencia and the others carried the victim to the trunk of the Pontiac and departed, defendant left in his truck and returned to the Sycamore house.

When defendant returned to the Sycamore house, Valencia *was waiting for him in the Pontiac.* Defendant then immediately got into the Pontiac and told Vazquez he would be right back. The foregoing indicates defendant was aware of the plan to abduct the victim from the start.

Even if defendant was not aware the plan was to kidnap the victim at the time Valencia carried the victim from the Clifford house, he certainly understood as much when he returned to the Sycamore house. Indeed, it could not have escaped defendant's attention the victim, who had been bound with zip ties and had her

face covered with tape, was no longer at the Clifford house when he left. Defendant also knew to get into the Pontiac when he arrived at the Sycamore house. This was the same car where the victim was being held captive in the trunk, and the same car that belonged to Cebrero. Cebrero was known only to defendant and was one of the two men seeking to recover the stolen drugs. Not only does this evidence suggest defendant was cognizant of the plan, it further indicates defendant was the one who knew where to find Ortega and Cebrero.

That Vazquez was not included in all the planning was evidenced by the fact that upon returning to the Sycamore house, defendant left with Valencia to pick up Ortega and Cebrero, leaving Vazquez behind. When defendant and Valencia returned, they were accompanied by Cebrero and Ortega, and the four "huddled up" without Vazquez. It was only when Vazquez approached the men after some time to ask for a cigarette that he learned what they were talking about. It can be inferred from this evidence that Cebrero and Ortega were the drug dealers who initially had the problem with the victim. Vazquez testified that to his knowledge defendant was the only one who knew them. This tended to show defendant was in charge of the plan.

Additionally, the discussion between defendant, Valencia, Cebrero, and Ortega indicates defendant knew of the kidnapping plot and facilitated its commission. Despite defendant's assertion to the contrary, Vazquez testified defendant was present in the group when Vazquez approached and the men were discussing the situation involving the victim. Defendant argues the evidence established he had left the group discussion before Vazquez made the comment regarding the victim being in the trunk. Not so. Vazquez testified he approached the group and told the others that when they questioned the victim about the missing drugs, she repeatedly said "Martha." He further testified all five men were present when it was mentioned "it was kinda bad" they could not find the drugs or the money. Vazquez also recounted there was some conversation about having the victim "right there" with them, and she did not have the drugs with her. Vazquez specifically stated defendant was present at that time.

It is true that according to Vazquez defendant had already left the group at the time Valencia stated he knew what to do and told Vazquez to bring him a bottle. However, when discussing exactly where defendant was at the time, Vazquez stated defendant "was barely walking away" and was only 12 feet away at the time. The jury could infer defendant heard this statement due to his proximity to the group as well as his participation in the earlier discussion. That defendant was present as part of the group of men discussing what had happened with the victim when Vazquez approached demonstrates he was in fact part of the plan. Furthermore, that Valencia stated he knew what to do and asked for gasoline just as defendant was walking away indicates the men had previously discussed what to do with the victim when defendant was part of the group.

In summary, the facts, as established at trial, lead to the inference that defendant knew of and participated in the plan to kidnap the victim from the beginning. Specifically: (1) defendant and Valencia expressly agreed to take the victim to the field; (2) the men wanted to conceal from the victim the fact defendant was in on the plan; (3) defendant gave Vazquez the keys to his truck while at the Clifford house; (4) upon returning to the Sycamore house, defendant entered the car with Valencia without discussion, telling Vazquez he would be right back; (5) when defendant returned, he was accompanied by the men who were looking for the drugs; (6) defendant along with Valencia, Ortega, and Cebrero congregated and discussed the issue of the missing drugs; (7) defendant was the only one who

knew both the victim and the men who were seeking the drugs; and (8) by defendant's own admission he believed Cebrero was responsible for what happened to the victim as a result of a drug dispute. Defendant's participation in the plan—bringing the victim to the Clifford house and bringing Cebrero and Ortega back to the Sycamore house while the victim was still within the trunk of the car—clearly demonstrated his specific intent to aid in the kidnapping.

Defendant points to specific facts to argue he did not have knowledge of the plan. However, defendant's argument misapprehends the standard of review on appeal. On appeal the question is whether the evidence is sufficient to support the verdict, not whether the evidence may also be reconciled with a contrary finding. (*People v. Stanley, supra,* 10 Cal.4th at pp. 792–793.) Even assuming defendant only learned of the kidnapping after the victim was taken from the Clifford house, his continued participation throughout the ordeal is sufficient to support his conviction. "[T]he crime of kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1159.) In order to be guilty as an aider and abettor of the kidnapping, a defendant need not assist the entire kidnapping. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.) Assistance during any portion of the offense will suffice. As we have already stated, defendant's participation in accompanying Valencia to pick up Cebrero and Ortega, the people the victim had taken the drugs from, while the victim was in the trunk of the car, demonstrated his continued facilitation of the plan. The jury was entitled to conclude defendant knew of the plan to kidnap the victim while the crime was ongoing and facilitated the plan. Thus, his claim fails.

. . .

### III. The Evidence Was Sufficient to Support the Felony–Murder Conviction

In what can only be characterized as a reiteration of the above arguments, defendant contends the evidence was insufficient to support his first degree felony-murder conviction. Defendant argues the evidence was insufficient to establish his guilt on the kidnapping charge for the reasons stated in the previous arguments. As such, he contends, the evidence was likewise insufficient to support his felony-murder conviction. We disagree.

Pursuant to section 189, all murder "which is committed in the perpetration of, or attempt to perpetrate ... kidnapping, ... is murder of the first degree." The crime of felony murder is established when the evidence shows "the defendant, either before or during the commission of the acts that caused the victim's death, had the specific intent to commit one of the listed felonies." (*People v. Lewis* (2001) 25 Cal.4th 610, 642.)

Although it is not required that the killing furthered or facilitated the felony, "there must be a logical nexus, beyond mere coincidence of time and place, between the felony the parties were committing or attempting to commit and the act resulting in death." (*People v. Cavitt* (2004) 33 Cal.4th 187, 201.)

Defendant's sole contention as to the insufficiency of the evidence to support the felony-murder conviction is that the evidence was insufficient to support a finding he aided and abetted in the kidnapping. As we have already held, the evidence was sufficient to support the kidnapping charge. Thus, defendant's argument fails.

Reyes, 2014 WL 7151809, at *5–8, 10.

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 556 U.S. 1, 2 (2011). Moreover, when AEDPA applies, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id. The Supreme Court has cautioned that "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Id.

Here, the California Court of Appeal applied California state law, which provides that a "person is liable as an aider and abettor when 'he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.'" Reyes, 2014 WL 7151809, at *6 (quoting People v. Delgado, 56 Cal. 4th 480, 486 (Cal. 2013)). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw, 546 U.S. at 76.

Viewing the evidence in the light most favorable to the prosecution and presuming that the jury resolved conflicting inferences in favor of the prosecution, the record established the following: Petitioner and Valencia discussed a problem regarding the victim taking marijuana from some drug dealers. Valencia told Petitioner to pick the victim up. (2 RT 120–21). Petitioner was the only one who knew the victim and the drug dealers. (2 RT 121, 124). Petitioner and Valencia agreed to take the victim "[s]omewhere in the fields." (2 RT 122). When Valencia instead took Vazquez to the Clifford house, Vazquez "guess[ed] [there was a] change of plans." (2 RT 127). Vazquez testified that the plan was "[t]hat we were going to maybe have to rough her up for her to give up the weed or the money." (2 RT 123). At the Clifford house, the men acted as if Petitioner was also a victim, but "[i]t was part of the show [to] make it look good" and Petitioner "was part of the plot." (2 RT 136, 138). Upon Petitioner's return to the Sycamore house, Valencia was waiting in the Pontiac with the victim in the trunk. Petitioner immediately entered the Pontiac and told Vazquez they would be right back. (2 RT 159–60). Petitioner and Valencia returned in the Pontiac with the men who were looking for the drugs—Cebrero and Ortega. (2 RT 160–62). At some point all five men congregated and Vazquez was asked what the victim was telling him. Vazquez informed them that the victim kept saying "Martha." (2 RT 162–63). There was a general discussion "[t]hat it was kind of bad we couldn't find the weed or the money." (2 RT 164–65).

In light of this evidence, "[w]hen the deference to state court decisions required by § 2254(d) is applied to the state court's already deferential review," Cavazos, 565 U.S. at 7, the state court's determination that Petitioner had intent to facilitate the kidnapping was not objectively unreasonable. "[W]hen we assess a sufficiency of evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011). Under this doubly deferential standard of review, the state court's denial of Petitioner's sufficiency of evidence claims regarding aiding and abetting kidnapping and felony-murder was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his sufficiency of the evidence claims, and they should be denied.

## C. Sentencing Error

Petitioner asserts that the single kidnapping cannot be used to increase punishment twice. (ECF No. 1 at 15, 18). Respondent argues that Petitioner's claim that he was improperly punished in violation of California Penal Code section 654 is a state law claim that this Court cannot review. (ECF No. 14 at 29).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim also was raised in the petition for review and petition for exhaustion, which the California Supreme Court summarily denied. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's sentencing claim, the California Court of Appeal stated:

**V. The Kidnapping Special Circumstance Was Properly Applied**

Defendant argues he was improperly punished in violation of section 654 for kidnapping, as the kidnapping was the basis of the felony-murder conviction, as well as the special circumstance. We conclude defendant was properly sentenced.

Section 654 provides:

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 189, which defines the different degrees of murder, declares that murder committed in the perpetration of kidnapping is murder of the first degree. Section 190 governs the punishment for murder. Subdivision (a) of that section provides:

"Every person guilty of murder in the first degree shall be punished by death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life. The penalty to be applied shall be determined as provided in Section 190.1, 190.2, 190.3, 190.4, and 190.5."

According to section 190.2, subdivision (a), the "penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state

prison for life without the possibility of parole if one or more of the following special circumstances has been found ... to be true."

It is evident from reading these statutes that defendant was punished only once for the kidnapping. Defendant was convicted in count 1 of first degree felony murder based upon the underlying felony of kidnapping. Thus, pursuant to section 190, subdivision (a), there were three options regarding his sentence. Because the jury also found the kidnapping-felony-murder special-circumstance allegation true pursuant to section 190.2, subdivision (a)(17)(B), and because the prosecution did not seek the death penalty, the penalty for the crime was set at a term of life without the possibility of parole. As a result, defendant was sentenced to a single term of life without the possibility of parole for the crime of first degree felony murder with the felony-murder special circumstance. Defendant was also convicted in count 2 of aggravated kidnapping, however, his sentence on that count was properly stayed as punishing him for felony murder based upon the underlying felony of kidnapping and punishing him again for the felony of kidnapping would violate the multiple punishment provision of section 654. (See *People v. Holt* (1997) 15 Cal.4th 619, 692 [terms for underlying felony properly stayed under § 654 when defendant also convicted of felony murder].)

Defendant asserts the increase in penalty from the crime of murder to the crime of first degree felony murder with special circumstances based upon the underlying felony of kidnapping violated the proscription against multiple punishments. But as the above demonstrates, defendant was never doubly *punished*; rather the *penalty* for his crime was increased based upon the fact the murder was committed in the commission of the kidnapping. As section 654 plainly states, when an act is proscribed in more than one provision, the provision which provides for the longest punishment shall be applied. Indeed, in *People v. Balderas* (1985) 41 Cal.3d 144, 200–201, our Supreme Court held section 654 permitted subjecting a defendant to an increased punishment for first degree felony murder even though the increased punishment was based upon a special circumstance that the murder was committed during the commission of the same underlying felony. *Balderas* has been repeatedly followed by our Supreme Court. (*People v. Webster* (1991) 54 Cal.3d 411, 455–456 [" 'triple-counting' " the same facts to impose first degree murder, special circumstance and an aggravating circumstance at penalty phase did not constitute double punishment]; *People v. Garrison* (1989) 47 Cal.3d 746, 793 [using same underlying felony as basis for felony-murder conviction and a special circumstance is not an impermissible dual use of facts]; *People v. Gates* (1987) 43 Cal.3d 1168, 1189–1190 [using same felony to support first degree felony murder and felony-murder special circumstance does not present multiple punishment problem], disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405; *People v. Coleman* (1988) 46 Cal.3d 749, 780 [using same felony for felony-murder conviction, special circumstance, and aggravating factor is proper].) We are, of course, bound to follow the decisions of our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Therefore, we reject defendant's argument.

Reyes, 2014 WL 7151809, at *11–12.

Whether Petitioner was punished in violation of California Penal Code section 654 is an issue of state sentencing law that is not cognizable in federal habeas corpus. See Corcoran, 562 U.S. at 5 ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment

23

susceptible to collateral attack in the federal courts."); Estelle, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994) ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief.").

To the extent Petitioner raises a double jeopardy claim, the Court finds Petitioner is not entitled to habeas relief. The double jeopardy protection against cumulative punishments "is designed to ensure that the sentencing discretion is confined to the limits established by the legislature. Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent." Ohio v. Johnson, 467 U.S. 493, 499 (1984) (citations omitted).

California Penal Code section 654 provides that an "act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Cal. Penal Code § 654(a). Petitioner was sentenced for his first-degree murder conviction with kidnapping special circumstance under the provision that provided for the longest potential term of imprisonment, and the sentence for the underlying felony of kidnapping was stayed. As noted by the California Court of Appeals, Petitioner "was never doubly *punished*; rather the *penalty* for his crime was increased based upon the fact the murder was committed in the commission of the kidnapping." Reyes, 2014 WL 7151809, at *12.

Based on the foregoing, the state court's denial of Petitioner's sentencing challenge was not contrary to, or an unreasonable application of, clearly established federal law,[8] nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility

---

[8] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker, 665 F.3d at 1148 n.1 (citing Early, 537 U.S. at 8). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

**V.**

**RECOMMENDATION AND ORDER**

Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 28, 2018**        /s/ _Erica P. Grosjean_

UNITED STATES MAGISTRATE JUDGE